UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

| | | |
|---|---|---|
| STATE OF SOUTH DAKOTA, | * | CIV 10-3007-RAL |
| COUNTY OF ROBERTS, SISSETON | * | |
| SCHOOL DISTRICT NO. 54-2 , CITY | * | |
| OF SISSETON, and WILMONT | * | |
| SCHOOL DISTRICT NO. 54-7, | * | OPINION AND ORDER |
| | * | GRANTING DEFENDANTS' |
| Plaintiffs, | * | MOTION FOR SUMMARY |
| | * | JUDGMENT |
| vs. | * | |
| | * | |
| UNITED STATES DEPARTMENT OF | * | |
| THE INTERIOR, LARRY ECHO | * | |
| HAWK, in his official capacity as | * | |
| Assistant Secretary of Indian Affairs, | * | |
| MICHAEL BLACK, in his official | * | |
| capacity as Regional Director, Great | * | |
| Plains Region, and RUSSELL | * | |
| HAWKINS, in his official capacity as | * | |
| Superintendent of Sisseton Agency, | * | |
| | * | |
| Defendants. | * | |

## I. INTRODUCTION

Plaintiffs State of South Dakota, County of Roberts, Sisseton School District, City of

Sisseton, and Wilmont School District (collectively "Plaintiffs") filed this action seeking

declaratory and injunctive relief from the Department of the Interior's decision to take four parcels

of land into trust for the Sisseton-Wahpeton Oyate of the Lake Traverse Reservation ("Tribe").

Defendants United States Department of the Interior; Larry Echo-Hawk, Assistant Secretary of

Indian Affairs, United States Department of the Interior; Michael Black, Great Plains Regional

Director, BIA; and Russell Hawkins, Sisseton Agency Superintendent (collectively

"Defendants") moved to dismiss Plaintiffs' claims or, in the alternative, for summary judgment

(Doc. 6).  Plaintiffs then filed a cross-motion for summary judgment (Doc. 10).  For the reasons

explained below, this Court grants Defendants' Motion for Summary Judgment.

## II. FACTS

In 2001, the Sisseton-Wapeton Oyate Tribal Council submitted applications to the Bureau of Indian Affairs ("BIA") requesting that the Secretary of the Interior ("Secretary") take four parcels of land into trust for the Tribe.  (Doc. 6-1, Doc. 13).  The parcels of land are located in Roberts County and are known as the Gardner (200 acres), German (80 acres), Peters (80 acres), and Smith (6 acres) parcels.  (Doc. 6-1, Doc. 13).  In the applications, the Tribe requested that the BIA place the Gardner, German, and Peters parcels in trust for agricultural and land consolidation purposes. (A.R. 3104, 4332, 5586).  The Tribe sought to have the Smith parcel placed in trust for land consolidation purposes only.  (A.R. 1911-12).

The initial decision concerning whether to take the land into trust fell to Russell Hawkins, the BIA's Sisseton Agency Superintendent ("Superintendent Hawkins").  (Doc. 6-1, Doc. 13). Superintendent Hawkins is a life-long member of the Tribe and served multiple terms as the Tribe's chairman before becoming the BIA's Sisseton Agency Superintendent.  (Doc. 12, Doc. 15).  In 2002, Superintendent Hawkins notified Plaintiffs and other local governments that the BIA had received the Tribe's applications and was considering them.  (Doc. 6-1, Doc. 13).  Plaintiffs provided comments opposing the trust acquisitions and requested that Superintendent Hawkins recuse himself from the case because of concerns of bias.  (A.R. 1276).

Superintendent Hawkins sent a memorandum to his supervisor, the Regional Director ("RD"), requesting the RD's opinion on whether Hawkins could conduct the initial review of the trust applications.  (A.R. 1232).  In a November 22, 2006 letter, the RD wrote that Plaintiffs' allegations of bias held "no validity whatsoever" and that Superintendent Hawkins could properly consider the trust applications.  (A.R. 1111-12).  The RD further noted that no law or regulation prohibits tribal members from working as BIA employees on their tribe's reservation, and that as long as the Tribe met the regulatory criteria for trust acquisitions, Superintendent Hawkins could approve the applications.  (A.R. 1111-12).  In January and February of 2007,  Superintendent

Hawkins issued decision letters rejecting Plaintiffs' allegations of bias and approving the acceptance of the Smith, Peters, Gardner, and German parcels into trust for the Tribe. (Doc. 6-1, Doc. 13, A.R. 3772).

Plaintiffs appealed Superintendent Hawkins' decisions to the RD. (Doc. 6-1, Doc. 13). Because the RD previously had advised Superintendent Hawkins that he could consider the trust applications, Plaintiffs asserted that the RD had "prejudged" an important issue and requested that the RD and the RD's office recuse themselves from the case. (A.R. 688). In a letter to Plaintiffs, the RD declined to recuse herself and stated that Plaintiffs had failed to allege any specific facts supporting their claim of bias. (A.R. 649). The RD also explained that her independent, objective review of the merits of Superintendent Hawkins's decisions would "cure any possible taint of bias." (A.R. 649).

In March of 2008, the RD affirmed Superintendent Hawkins' decisions with regard to each of the four parcels. (Doc. 6-1, 13). In doing so, the RD concluded that "[t]he state has not submitted any evidence that shows decision makers of the BIA **have not** followed existing federal regulations or federal laws when making a decision on fee to trust transactions." (A.R. 611) (emphasis in original). Plaintiffs then appealed the matters to the Interior Board of Indian Appeals ("IBIA"). The IBIA, on December 30, 2009, affirmed the RD's decisions. (Doc. 6-1, Doc. 13). The IBIA's opinion considered and rejected both Plaintiffs' substantive claims and their claims of bias.

Plaintiffs now contend that the trust acquisition was unlawful for a number of reasons. First, Plaintiffs challenge the constitutionality of § 5 of the Indian Reorganization Act ("IRA"), which provides the Secretary of the Interior with the authority to acquire trust land for Indian tribes. Plaintiffs claim that § 5 is an unconstitutional delegation of legislative power and that it operates to deprive South Dakota of a republican form of government. Next, Plaintiffs argue that Superintendent Hawkins and the RD were biased and that the BIA as a whole is biased when

3

considering trust applications.  Finally, Plaintiffs argue that the BIA's decision to take the parcels of land into trust was arbitrary and capricious and therefore should be set aside under the Administrative Procedure Act ("APA").[1]

## III.  DISCUSSION

### A.  Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  A party opposing a properly made and supported motion for summary judgment "may not rely merely on allegations or denials in its own pleading; rather, its response must - by affidavits or as otherwise provided in this rule - set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e).  "To survive summary judgment, a plaintiff must substantiate his allegations with enough probative evidence to support a finding in his favor."  Adam v. Stonebridge Life Ins. Co., No. 09-3014, 2010 U.S. App. LEXIS 14492, at *8 (8th Cir. July 15, 2010) (quoting Roeben v. BG Excelsior Ltd. P'ship, 545 F.3d 639, 642 (8th Cir. 2008)).  In a determination of whether summary judgment is warranted, the evidence is "viewed in the light most favorable to the nonmoving party."  True v. Nebraska, No. 09-1788, 2010 U.S. App. LEXIS 14007, at *3 (8th Cir. July 9, 2010 (quoting Cordry v. Vanderbilt Mortgage & Fin., Inc., 445 F.3d 1106, 1109 (8th Cir. 2006)).  "If opposing parties tell two different stories, the court

---

[1]  In their response (Doc. 11) to Defendants' motion to dismiss or, in the alternative, motion for summary judgment, Plaintiffs only address their claims of bias.  Defendants argue that Plaintiffs have conceded all of their other claims by failing to respond to the remainder of Defendants' motion.  See Doc. 14 (citing Satcher v. Univ. of Arkansas at Pine Bluff Bd. of Tr., 558 F.3d 731, 735 (8th Cir. 2009) ("[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument.")).  Indeed, Plaintiffs' counsel at oral argument seemed to waive their challenges to the constitutionality of § 5 of the IRA.  This Court nevertheless will address the arguments Plaintiffs failed to defend in their brief.

must review the record, determine which facts are material and genuinely disputed, and then view those facts in a light most favorable to the non-moving party, as long as those facts are not so blatantly contradicted by the record that no reasonable jury could believe them. Id. (internal quotations omitted). In this case, neither Plaintiffs nor Defendants point to any genuine dispute of material facts, and both Plaintiffs and Defendants have filed cross-motions for summary judgment.

**B. Constitutionality of Section 5 of the IRA**

Section 5 of the IRA provides in pertinent part that:

> The Secretary of the Interior is authorized, in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or surface rights to lands, within or without existing reservations, including trust or otherwise restricted allotments, whether the allottee be living or deceased, for the purpose of providing land for Indians.
> ***
> Title to any lands or rights acquired pursuant to this Act . . . shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands or rights shall be exempted from State and local taxation.

25 U.S.C. § 465. Plaintiffs claim that § 5 of the IRA is an unconstitutional delegation of legislative power because it fails to establish adequate standards by which to guide the BIA's decision concerning the taking of land into trust.[2] The United States Court of Appeals for the Eighth Circuit

---

[2] Defendants point out that in the RD's decision to take the parcels of land into trust, she identified P.L. 97-459, P.L. 98-513, and P.L. 93-491 as the federal legal authority to bring the land into trust. (A.R. 3257). P.L. 98-513 grants the Secretary the authority to take land into trust for the purpose of "consolidating tribal interests in land, and developing tribal agriculture or commercial enterprises." P.L. 98-513, § 9, 98 Stat. 2411, 2414 (1984). P.L. 93-491 grants the Secretary the authority to take land into trust for the purpose of "consolidating landholdings . . . providing land for any tribal program for the improvement of the economy of the tribe and its members through the development of industry . . . and the general rehabilitation and enhancement of the total resource potential of the reservation." Pub. L. 93-491, § 1, 88 Stat. 1468, 1468 (1974). These statutes are specific to the Sisseton-Wahpeton Oyate Tribe. Defendants argue that because the BIA relied on Public Laws 93-491 and 98-513 rather than § 5 of the IRA, Plaintiffs' constitutional arguments are irrelevant. This Court will nonetheless address Plaintiffs § 5 arguments.

specifically addressed this argument in <u>South Dakota v. U.S. Dep't of Interior</u>, 423 F.3d 790 (8th Cir. 2005) (<u>South Dakota II</u>).[3]  In <u>South Dakota II</u>, the Secretary exercised its authority under § 5 of the IRA and accepted 91 acres of land into trust for the Lower Brule Sioux Tribe.  <u>Id.</u> at 794. The State and other plaintiffs raised several arguments in opposition to the Secretary's decision, including a non-delegation challenge identical to the one Plaintiffs make in the present case.[4]  The Eighth Circuit explained that "Congress may delegate its legislative power if it lays down by legislative act an intelligible principle to which the person or body authorized to act  is directed to conform." <u>Id.</u> at 795. (citation and internal marks omitted).  The Court then rejected the contention that § 5 failed to delineate any boundaries governing the Secretary's trust acquisition decisions, instead finding that:

> an intelligible principle exists in the statutory phrase 'for the purpose of providing land for Indians' when it is viewed in the statutory and historical context of the IRA.  The statutory aims of providing lands sufficient to enable Indians to achieve self-support and ameliorating the damage resulting from the prior allotment policy sufficiently narrow the discretionary authority granted to the Department.

<u>Id.</u> at 799.

Other courts considering non-delegation challenges to § 5 have reached the same conclusion.  See <u>Michigan Gaming Opposition v. Kempthorne</u>, 525 F.3d 23, 33 (D.C. Cir. 2008)

---

[3] There are four prior published opinions involving taking lands into trust between the State of South Dakota and the United States Department of Interior, to which this Court cites in this Opinion and Order.  To avoid confusion, this Court refers to them in chronological sequence as <u>South Dakota I</u>, <u>South Dakota II</u>, <u>South Dakota III</u> and <u>South Dakota IV</u>.

[4] The State also raised the same non-delegation argument in a trust acquisition case before Chief Judge Karen E. Schreier in 2005.  See <u>South Dakota v. U.S. Dep't of Interior</u>, 401 F.Supp. 2d 1000, 1005 (D. S.D. 2005) ("<u>South Dakota III</u>") (finding <u>South Dakota II</u> "factually identical and controlling" and holding that § 5 of the IRA was not an unconstitutional delegation of power).  On appeal of Chief Judge Schreier's decision, the State again presented the non-delegation argument to the Eighth Circuit.  <u>South Dakota v. U.S. Dep't of Interior</u>, 487 F.3d 548, 551 (8th Cir. 2007) ("<u>South Dakota IV</u>" (declining to reconsider its decision in <u>South Dakota II</u>).

(agreeing with the First, Eighth, and Tenth Circuits that § 5 is not an unconstitutional delegation of legislative authority);  Carcieri v. Kempthorne, 497 F.3d 15, 43 (1st Cir. 2007) ("We hold that section 465 is not an unconstitutional delegation of legislative authority.");  United States v. Roberts, 185 F.3d 1125, 1137 (10th Cir. 1999) (rejecting argument that § 5 unconstitutionally "delegates standardless authority to the Secretary");  Cent. New York Fair Bus. Ass'n v. Salazar, Nov. 608-CV-660, 2010 WL 786526 at *4 (N.D.N.Y. Mar. 1, 2010) ("Every court to consider a delegation challenge to § 465 has rejected it and found that agency regulations sufficiently limit the Secretary of the Interior's discretion.") (citations omitted).  Accordingly, this Court finds that § 5 of the IRA is not an unconstitutional delegation of legislative authority.

Plaintiffs also argue that § 5 of the IRA deprives them of a republican form of government because Plaintiffs lose jurisdiction and authority over land that the BIA takes into trust for the Tribe.  Article IV, § 4 of the United States Constitution contains the "Guarantee Clause," providing that the "United States shall guarantee to every state in this union a republican form of government. . ."  U.S. Const. art. IV § 4.  Claims under the Guarantee Clause usually are considered political questions, and courts rarely find them justiciable.  See New York v. United States, 505 U.S. 144, 184 (1992) ('[T]he guarantee clause has been an infrequent basis for litigation throughout our history.  In most of the cases in which the Court has been asked to apply the Clause, the Court has found the claims presented to be nonjusticiable under the 'political question' doctrine.") (citations omitted); see also Deer Park Indep. Sch. Dist. v. Harris County Appraisal Dist., 132 F.3d 1095, 1099 (5th Cir. 1998) ("[T]he Supreme Court has held that challenges to Congressional action under the Guarantee Clause are not justiciable.") (citations omitted); 13C Wright et. al. Federal Practice and Procedure § 3534.1 (3d 2008) ("[I]t has been well established that political questions are presented by challenges to either congressional or state action grounded on the constitutional

mandate in Article IV, § 4, that the United States shall guarantee every state a "Republican Form of Government.").  Plaintiffs' Guarantee Clause challenge to § 5 of the IRA presents a non-justiciable political question.

Even if Plaintiffs' Guarantee Clause claim was justiciable, § 5 of the IRA does not violate the Guarantee Clause.  The Supreme Court defined a Republican Form of Government in Duncan v. McCall, 139 U.S. 449, 461 (1891) as follows:

> [T]he right of the people to choose their own officers for governmental administration, and pass their own laws in virtue of the legislative power reposed in representative bodies, whose legitimate acts may be said to be those of the people themselves, but while the people are thus the source of political power, their governments, national and state, have been limited by written constitutions, and they have themselves thereby set bounds to their own power, as against the sudden impulses of mere majorities.

Id.  The fact that Plaintiffs will no longer be able to exercise jurisdiction and authority over the four parcels of land does not pose a "realistic risk of altering the form or the method of functioning of [Plaintiffs'] government."  New York, 505 U.S. at 186; see also City of Lincoln v. U.S. Dep't of Interior, 229 F.Supp. 2d 1109, 1117 (D. Or. 2002) (holding that a transfer of tribal land located within city limits into trust did not violate the Guarantee Clause even though the transfer allowed tribal members to vote in local elections without being subject to local regulation or taxation).  At most, the BIA's placement of the parcels into trust merely reduces the area over which Plaintiffs may exercise certain jurisdictional powers of their already existing republican form of government.

**C.  Claim of Superintendent Hawkins' Bias**

Plaintiffs focus much of their argument on the assertion that Superintendent Hawkins, as a tribal member and former tribal chairman, was biased and thus Plaintiffs' Due Process Clause

rights were violated.  A fair and unbiased tribunal is a fundamental requirement of the Due Process Clause.  See In Re Murchison, 349 U.S. 133, 136 (1955) ("a fair trial in a fair tribunal is a basic requirement of due process.");  Marshall v. Jerrico, Inc., 446 U.S. 238, 242 (1980) ("The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases.").  This requirement applies to courts and administrative agencies alike.  See Withrow v Larkin, 421 U.S. 35, 46-47 (1975) (noting that the fair tribunal requirement of due process "applies to administrative agencies which adjudicate as well as to courts.");  Deretich v. Office of Admin. Hearings, State of Minn., 798 F.2d 1147, 1152 (8th Cir. 1986) ("[A] hearing officer must be impartial for an administrative agency to meet the requirements of due process.") (citations omitted); see also South Dakota III, 401 F.Supp. 2d at 1011 ("The Department of Interior's review of an application to take land into trust is subject to the due process clause and must be unbiased.") (citations omitted).

The Eighth Circuit has held, however, that "[i]t requires a substantial showing of bias to disqualify a hearing officer in administrative proceedings or to justify a ruling that the hearing was unfair."  United States ex rel. De Luca v. O'Rourke, 213 F.2d 759, 765 (8th Cir. 1954).  Indeed, a party claiming bias on the part of an administrative tribunal must overcome "a presumption of honesty and integrity in those serving as adjudicators."  In Re Morgan, 573 F.3d 615, 624 (8th Cir. 2009) (quoting Withrow, 421 U.S. at 47.).  "Plaintiffs bear the heavy burden of establishing that the administrative hearing was unfair."  South Dakota III, 401 F.Supp. 2d at 1011 (citing Cent. Ark. Auction Sale, Inc. v. Bergland, 570 F.2d 724, 731 (8th Cir. 1978)).

9

Plaintiffs assert that Superintendent Hawkins exhibited actual bias against Plaintiffs in reviewing the Tribe's trust applications.  As evidence of this, Plaintiffs point to Superintendent Hawkins' use of the following language in each of his four written decisions:

> The State's comments about Superintendent Russell Hawkins and the BIA are biased against the State and favor the Tribe because Mr. Hawkins is a Tribal member and former elected Tribal Chairman holds no validity whatsoever.

(A.R. 3772, 4987, 2576, 1105).   Plaintiffs contend that this statement shows that the "Superintendent thus accused the *State* of bias in his review of the State's argument.  His charge is unfounded and intemperate and his failure to offer any evidence in support simply reflects that this charge is motivated by ill-will against the State."  (Doc. 11 at 29).

Plaintiffs have misinterpreted what Superintendent Hawkins wrote.  Rather than accusing the State of bias, Superintendent Hawkins was attempting to refute the State's accusations, and made a typographical error by using the verb "holds" rather than "hold."  The sentence in question, properly read, is: "The State's comments [- that] Superintendent Russell Hawkins and the BIA are biased against the State and favor the Tribe because Mr. Hawkins is a tribal member and former elected Tribal Chairman [-] hold[] no validity whatsoever."  (A.R. 3772, 4987, 2576, 1105,  with bracketed material added to aid proper reading).  It makes no sense to read the sentence as urged by Plaintiffs to suggest that Hawkins called the State biased.  Read as Plaintiffs urge, the sentence would be the following nonsense: "The State's comments . . . are biased against the State and favor the Tribe,"  and, the final clause of "holds no validity whatsoever" likewise would be rendered surplusage.

Plaintiffs also argue that Superintendent Hawkins' exhibited bias by failing to address the same Due Process Clause argument Plaintiffs now raise in this Court.  However, in response to Plaintiffs' assertion that he was biased, Superintendent Hawkins cited a delegation of authority in 3 IAM Great Plains Regional Addendum and stated that "[t]here is no statute or law that states

10

employees of the Bureau of Indian Affairs are not allowed to work on the reservation in which they are enrolled members." (A.R. 3772, 4987, 2576, 1105). Superintendent Hawkins' failure to engage in a lengthy constitutional analysis of Plaintiffs' due process argument does not amount to the "substantial showing of bias" necessary to disqualify him from considering the Tribe's trust applications. O'Rourke, 213 F.2d at 765.

Plaintiffs, relying principally on Caperton v. A.T. Massey Coal Co., Inc., 129 S.Ct. 2252 (2009), also contend that Superintendent Hawkins' membership in the Tribe and previous service as tribal chairman created an unconstitutional probability of bias.[5]  In Caperton, the United States Supreme Court explained that while "most matters relating to judicial disqualification do not rise to a constitutional level," there are certain rare situations where "the probability of actual bias on the part of the judge or decisionmaker" violates the Due Process Clause. Id. at 2259.  The Court identified two instances where it had found due process violations.  One instance concerned the ability of a judge to remain impartial in a criminal contempt proceeding where the judge previously had been the object of the defendant's contempt. Id. at 2261.  The other instance concerned recusal where the decisionmaker had a financial interest in the case. Id. at 2260-62 (discussing Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813 (1986) (violation of due process for an Alabama Supreme Court justice to participate in an action seeking punitive damages from an insurance company when the justice was a plaintiff in a very similar case pending below); Gibson v. Berryhill, 411 U.S. 564

---

[5]  Plaintiffs also point to other "circumstances" as evidence that an unconstitutional probability of bias existed, including: 1) Superintendent Hawkins' Tribe is a "distinct political community"; 2) "Tribal members in South Dakota exhibit a high degree of cohesion among themselves;" 3) Hawkins, as "Superintendent assumes a special relationship for the welfare of the tribe emanating from the special relationship of the United States to the tribes"; 4) The "Supreme Court has described employment in the BIA, including the position of the Superintendent, to be 'participation by the governed in the governing agency'"; and 6) "The documents governing the BIA provide that the tribe is required to be given input on the selection of the Superintendent, while non-Indians living in the vicinity are not required to be given such input." (Doc. 11).  These "circumstances" essentially amount to an argument that the BIA as a whole is structurally biased. The Court addresses Plaintiffs' structural bias argument below.

(1973) (an administrative board composed of private optometrists had a pecuniary interest of such "sufficient substance" that due process precluded it from presiding over a hearing against competing corporate optometrists); Ward v. Vill. of Monroeville, Ohio, 409 U.S. 57 (1972) (mayor's position of traffic court judge violated due process where mayor was responsible for producing revenue for the city, and the fines imposed by his court amounted to a "substantial portion of the municipality's funds."); Tumey v. State of Ohio, 273 U.S. 510 (1927) (Due Process Clause required recusal where mayor who sat as judge in certain cases was only paid for his judicial services if he convicted the defendant). The Supreme Court in Caperton noted that in every case where it found that the Constitution required judicial recusal, the Court "dealt with extreme facts that created an unconstitutional probability of bias that 'cannot be defined with precision.'" Caperton, 129 S.Ct. at 2265-66 (quoting Lavoie, 475 U.S. at 822 (1986)); see also United States v. Rodriguez, No. 08-16696, 2010 WL 5175110, at *9 (11th Cir. Dec. 22, 2010) (noting that the holding in Caperton was narrow and limited to the "extraordinary situation where the probability of actual bias rises to an unconstitutional level.") (internal quotations and citation omitted). Under Caperton, the determination of whether the facts in a particular case are extreme enough to create an unconstitutional probability of bias involves an objective inquiry, based on whether, "under a realistic appraisal of psychological tendencies and human weakness, the interest poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented." Caperton, 129 S.Ct. at 2263 (quoting Withrow, 421 U.S. at 47.).

The facts of this case do not present one of the "rare instances" where the Constitution requires judicial recusal. See id. at 2267 ("Application of the constitutional standard in this case will . . . be confined to rare instances."); see also Bracy v. Gramely, 520 U.S. 899, 904 (1997) ("[M]ost questions concerning a judge's qualifications to hear a case are not constitutional ones, because the Due Process Clause . . . establishes a constitutional floor, not a uniform standard.") (citations omitted). Here, Superintendent Hawkins was not involved in the Tribal Council's

decision to submit trust applications for the four parcels at issue to the Secretary.  In fact, Hawkins' service as Tribal Chairman ended nearly six years before he became Superintendent.  (Doc. 12, 15). Superintendent Hawkins received his salary regardless of whether he took the four parcels of land into trust.  Any general benefit that Superintendent Hawkins might receive as a tribal member from the Department of Interior ultimately taking the land into trust for the Tribe is "too remote and insubstantial" to create an unconstitutional probability of bias.  Lavoie, 475 U.S. 813, 824 (1986) ("At some point, 'the biasing influence . . . will be too remote and insubstantial to violate the constitutional constraints.'" ) (quoting Marshal v. Jerrico, Inc., 446 U.S. 238, 243 (1980)); see also Commonwealth of Northen Mariana Islands v. Kaipat, 94 F.3d 574, 581-82 (9th Cir. 1996) (not a violation of due process for judge to impose fine on defendant even though legislature had earmarked such fines for a judicial building fund because the judge had no "direct, personal, substantial, pecuniary interest in reaching a conclusion against [the defendant] in his case.") (quoting Tumey, 273 U.S. at 523); In Re Drexel Burnham Lambert, Inc., 861 F.2d 1307, 1313 (2nd Cir. 1988) ([W]here an interest is not direct, but is remote, contingent, or speculative, it is not the kind of interest which reasonably brings into question a judge's impartiality.") (citations omitted). In short, Superintendent Hawkins, notwithstanding his prior service as tribal chairman and membership in the Tribe, could " hold the balance nice, clear and true." Caperton, 129 S.Ct. at 2261 (quoting Lavoie, 475 U.S. at 825)).  Moreover, allowing Superintendent Hawkins to consider the trust applications advances the purpose of the IRA.  See Morton v. Mancari, 417 U.S. 535, 541-43 (1974) (explaining that one of the purposes of the IRA was to allow Indian tribes to assume a "greater degree of self-government" and that "[o]ne of the primary means by which self-government would be fostered and the Bureau made more responsive was to increase the participation of tribal Indians in BIA operations.").

13

Rather than presenting one of the rare situations where the probability of bias violates the Constitution, Plaintiffs' bias claim is similar to cases finding that a decisionmaker's prior employment or affiliation with a group does not require recusal. See United States v. Vazquez, 193 Fed. Appx. 168, 169 (3rd Cir. 2006) (federal district judge who formerly was a deputy criminal chief in the U.S. Attorney's Office prosecuting defendant was not required to recuse himself from case where judge was not involved with investigation or prosecution of defendant); Foster v. Capshaw, 72 Fed. Appx. 192, 193 (5th Cir. 2003) (district judge was not required to recuse himself from RICO action against the State Bar Association of Texas even though judge was a member of the bar); Maurey v. University of Southern California, 12 Fed. Appx. 529, 532 (9th Cir. 2001) (judge not required to recuse herself from case involving university, even though judge was an alumna of university's law school, and was a member of law school's board of councilors); Lunde v. Helms, 29 F.3d 367, 370 (8th Cir. 1994) (recusal not required where judge graduated from law school at a university that was a defendant in the case); Doyle v. Arlington Cnty. Sch. Bd., 953 F.2d 100, 102-03 (4th Cir. 1991) (fact that judge previously served on school board that was now a party before him did not require recusal, where judge terminated his position as school board member four years before the dispute in question arose); Valente v. University of Dayton, No. 3:08-CV-225, 2009 WL 4255508, at * 3 (S.D. Ohio Nov. 19, 2009)  (Due Process Clause did not require judge to recuse himself from case involving his former law school, even though judge was previously employed by the law school and was friendly with many of its faculty).  Accordingly, the facts of this case neither create an unconstitutional probability of bias nor overcome the "presumption of honesty and integrity" on the part of Superintendent Hawkins.  Morgan, 573 F.3d at 624.

**D.  Effect of RD's Review on Bias Claim**

When a subordinate BIA official such as Superintendent Hawkins issues a decision, 25 C.F.R. § 2.4 provides for an appeal to the supervisory Regional Director.  Because Superintendent Hawkins' decision was subject to appeal to the RD, it was not considered "final

14

so as to constitute Departmental action subject to judicial review under 5 U.S.C. 704 . . ."   25 C.F.R. § 2.6(a).   Superintendent Hawkins' decisions would have become final, however, if Plaintiffs had not filed an appeal.  25 C.F.R. § 2.6(b) ("Decisions made by officials of the [BIA] shall be effective when the time for filing a notice of appeal has expired and no notice of appeal has been filed.").   Defendants now contend that even if Superintendent Hawkins was not an impartial decisionmaker the RD's review cured any such bias.

The Supreme Court considered a similar argument in Ward, 409 U.S. at 58.  The Ward case involved a mayor of an Ohio town who also sat as a traffic court judge.  Id. The mayor was responsible for the town's finances, and the fines he imposed contributed substantially to the town's revenue.  Id. at 58.  On appeal to the United States Supreme Court, the Ohio town argued that any unfairness at the trial level created by the mayor's conflicting roles could be "corrected on appeal and trial de novo in the County Court of Common Pleas."  Id. at 84.  The Supreme Court disagreed, stating that:

> This procedural safeguard does not guarantee a fair trial in the mayor's court; there is nothing to suggest that the incentive to convict would be diminished by the possibility of reversal on appeal.  Nor, in any event, may the State's trial court procedure be deemed constitutionally acceptable simply because the State eventually offers a defendant an impartial adjudication. Petitioner is entitled to a neutral and detached judge in the first instance.

Id. at 84-85.  Defendants attempt to distinguish the present case from Ward by claiming that Superintendent Hawkins' decision was not "final" and had not yet reached the point of judicial review.  This Court need not resolve this issue because Plaintiffs have failed to show either actual bias or an unconstitutional probability of bias.

**E. Claim of Institutional Bias on the Part of the BIA**

Plaintiffs contend that the inherent structural bias of the BIA in favor of Native Americans rendered the decision to take land into trust for the Tribe to be a violation of due process.  Plaintiffs

15

further claim that the BIA's policies requiring its employees to promote tribal self-government contributes to the institutional bias of the BIA, and that the BIA regulations governing trust acquisitions "have resulted in an irrebuttable presumption and pre-determined result" against Plaintiffs. (Doc. 9).

This argument that the structural bias of the BIA violate due process is not a novel one. Indeed, the State of South Dakota raised this same claim in this Court in 2005. See South Dakota III, at 1011. In that case, Chief Judge Karen E. Schreier reasoned that:

> [P]laintiffs' structural bias argument lacks merit. The BIA's policies of tribal self-determination, Indian self-government, and hiring preference for Indians are policies established by Congress in the IRA. The United States Supreme Court has found the preference policy is reasonable and rationally designed to further Indian self-government and does not violate due process. Following Congress's statutory policies does not establish structural bias warranting reversal of the [a BIA employee's] decision.

Id. (citations omitted). This Court agrees with the District Court's reasoning in South Dakota III, and thus does not find Plaintiffs' structural bias argument to warrant reversal of Defendants' decisions.

**F. The BIA's Application of Department of Interior Regulations**

Plaintiffs argue that the BIA's decision to take the four parcels of land into trust was arbitrary and capricious and thus in violation of the Administrative Procedure Act ("APA"). Although review of agency action under the APA must be "searching and careful," a court may only set aside decisions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." Thomas v. Jackson, 581 F.3d 658, 664 (8th Cir. 2009). Agency action is arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decisions that runs counter to the evidence before the agency, or is so implausible that it could

16

> not be ascribed to a difference in view or the product of agency
> expertise.

In Re Operation of Missouri River System Litigation, 421 F.3d 618, 628 (8th Cir. 2005) (citations omitted).  This Court affords "substantial deference to an agency's interpretation of its own regulation . . ."  South Dakota IV, 487 F.3d at 551.  Furthermore, this Court will uphold the BIA's decision to take the four parcels of land into trust if it is "supportable on any rational basis."  Voyageurs Nat'l Park Ass'n v. Norton, 381 F.3d 759, 663 (8th Cir. 2004) (citation omitted).

Plaintiffs now contend that the BIA's decisions were arbitrary and capricious because the BIA failed to adequately analyze the factors set out at 25 C.F.R. Part 151 and because the BIA's decisions failed to comport with the statutory aims of § 5 of the IRA.[6]  See 25 C.F.R. Part 151 (laying out the factors the Secretary is required to consider when deciding whether to take land into trust for a tribe).  Specifically, Plaintiffs take issue with: 1) The BIA's analysis of the Tribe's need for the land under 25 C.F.R. § 151.10(b); 2) The BIA's consideration of the impact on local governments from removing the four parcels of land from the tax base under 25 C.F.R. § 151.10(e); 3) The BIA's analysis of potential jurisdictional problems under 25 C.F.R. § 151.10(f); 4) The lack of evidence supporting the BIA's finding that it was able to assume responsibility for the four parcels of land under 25 C.F.R. § 151.10(g); and 5) Whether the BIA 's findings met the statutory aims of § 5 of the IRA.  Plaintiffs bear the burden of proving that the BIA's analysis of these factors

---

[6]  In paragraph 38 of their complaint, Plaintiffs also argue that the BIA's decisions were arbitrary and capricious because the BIA "failed to require the Tribe to meet its burden of proof on its requests, as set forth in 25 C.F.R. § 151.9 . . . " (Doc. 1).  Section 151.9 states that:

> An individual Indian or tribe desiring to acquire land in trust status
> shall file a written request for approval of such acquisition with the
> Secretary.  The request need not be in any special form but shall set
> out the identity of the parties, a description of the land to be acquired,
> and other information which would show that the acquisition comes
> within the terms of this part.

25 C.F.R. § 151.9.  There is no mention of a burden of proof in the text of § 151.9.  Moreover, the ultimate issue is whether the BIA properly analyzed the Part 151 factors as discussed in this Opinion and Order.

was arbitrary and capricious.  South Dakota II, 423 F.3d at 800 (citation omitted).  To meet this burden of proof, Plaintiffs must "[p]resent evidence that the [BIA] did not consider a particular factor; it may not simply point to the end result and argue generally that it is incorrect."  Id.

**1.  The Tribe's Need For the Land**

Section 151.10(b) requires the BIA to consider the "need of the . . . tribe for additional land." 25 C.F.R. § 151.10(b).  Plaintiffs argue that the BIA failed to "comply with the requirement of 25 C.F.R. 151.10(b) that the Tribe demonstrate a need for the land to be held in trust."  (Doc. 1 at 10).  However, § 151.10(b) does not require the BIA to consider why the Tribe needs the land held *in trust*.  South Dakota II, 423 F.3d at 801 ("[I]t would be an unreasonable interpretation of 25 C.F.R. § 151.10(b) to require the Secretary to detail specifically why trust status is more beneficial than fee status in the particular circumstance.") (citing South Dakota v. U.S. Dep't of Interior, 314 F.Supp. 2d 935, 943 (D.S.D. 2004) ("South Dakota I").  Rather, § 151.10(b) requires only that the BIA's "analysis express the Tribe's needs and conclude generally that IRA purposes were served."  South Dakota II, 423 F.3d at 801; see also South Dakota I, 314 F.Supp. 2d at 943 ("Regulation § 151.10(b) requires that the Secretary must merely explain why the Tribe needs the additional land.").

In the present case, the RD separately addressed the Tribe's need for each of the four parcels.  The RD found that the Peters, Gardner, and German parcels were all needed for "agricultural and land consolidation purposes."  (A.R. 2072-73, 3257, 4495).  The RD further explained that the Tribe uses these three parcels for several purposes, including leasing portions of the land for farming, growing hay to support the Tribe's buffalo herd, and (in regard to the Gardner and German parcels only) for a gravel pit.  Id.  The RD also noted how these activities benefit the economy of the Tribe, with profits generated by the leased land and buffalo herd being used to support both the Tribal Fish and Wildlife Department and the Tribal Realty Department.  Id.  The Tribe needed the Smith parcel primarily to provide housing for medical personnel who work at the

nearby Indian Health Services Hospital.  Id. at 608.  The RD noted that having housing for medical staff so near the hospital benefitted all tribal members because it allowed for a quick response to medical emergencies.  Id. at 608-09.  In each of her decision letters, the RD explained that accepting the land into trust promoted tribal self-determination and ensured that the needs of future tribal generations were secured and protected.  Id. at 608, 2072, 3257, 4495.  The RD's decisions thus expressed both the Tribe's need for the parcels of land and concluded that the purposes of the IRA were served.  See Felix Cohen, Cohen's Handbook of Federal Indian Law § 1.05 at 86 (5th ed. 2005) (The IRA was meant "to encourage economic development, self-determination, cultural pluralism, and the revival of tribalism.").  Accordingly, this Court finds that there was a rational basis for the RD's decision.

Plaintiffs also argue that the Tribe did not "need" the land because, at the time of the initiation of the trust process, the Tribe already owned the land.  (Doc. 1 at 10).  The Eighth Circuit already has rejected this argument.  See South Dakota IV, 487 F.3d at 552 n.3 ("In holding that the Secretary acted within his discretion in acquiring the land in trust for [a tribe], we necessarily reject the State and the County's assertion that [a tribe] does not need the land for 'self-support' because it already owns the land.").

## 2.  Removal of the Four Parcels of Land From the Tax Rolls

Section 151.10(e) requires the BIA to consider "the impact on the State and its political subdivisions resulting from the removal of the land from the tax rolls."  25 C.F.R. §151.10(e).  In her decision letters, the RD explained that Roberts County would lose $259.34 in property taxes on the Peters parcel, $254.92 on the German parcel, $1,300.86 on the Gardner parcel, and $1,474,80 on the Smith parcel.  (A.R. 2073, 4496, 3259, 610).  The RD then compared these figures to the $2,789,388 that the County collects in property taxes each year and found that, in each case, the County's loss would be insignificant.  Id.  In her review of the Peters, German, and Gardner

Parcel, the RD also considered the impact that accepting the land into trust would have on the Wilmont and Sisseton School Districts.  (A.R. 2073, 4496, 3258).  The RD further noted that she had received no documents showing that "the loss of taxes will impose economic distress on the State and other local governments."  (A.R. 2073, 4495, 3259, 610).  Plaintiffs contend that this analysis was insufficient, however, because the BIA failed to consider the "cumulative impact of the removal of thousands of acres from the tax rolls of the governmental subdivisions."  (Doc. 1 at 11).  However, the text of § 151.10(e) contains no requirement that the BIA consider such a hypothetical "cumulative impact."  South Dakota III, 401 F.Supp. 2d at 1008 (rejecting the State of South Dakota's argument that 25 C.F.R. § 151.10(e) required consideration of the cumulative effect of all trust land on the tax rolls); see also Shawano County, Wis. v. Midwest Reg'l Dir., 40 IBIA 241, 249 (2005) (explaining that the plain language of § 151.10(e) establishes that analysis of the cumulative effects of tax loss on all lands within a party's jurisdictional boundaries is unnecessary); Ziebach County, S.D. v. Acting Great Plains Reg'l Dir., 38 IBIA 227, 230 (2002) ("[A]n analysis of cumulative impact is not required by the language of 25 C.F.R. § 151.10(e).") (citations omitted).  Because the IBIA's interpretation of § 151.10(e) is not "plainly erroneous or inconsistent with the regulation," it is entitled to "substantial deference."  See South Dakota IV, 487 at 551.  The RD was only required to consider the impact of removing the four parcels of land from the tax rolls, and the RD's analysis of 151.10(e) was sufficient and supported by a rational basis.

**3.  The BIA's Consideration of Potential Jurisdictional Problems**

Section 151.10(f) requires the BIA to consider "[j]urisdictional problems and potential conflicts of land use which may arise" as a result of the BIA's taking land into trust for a tribe.  25 C.F.R. 151.10(f).  Plaintiffs argue that the BIA failed to "adequately consider the evidence

20

submitted by the State and local units of government concerning the jurisdictional and land use conflicts that would result from the land being taken into trust." (Doc. 1 at 11).

The BIA fulfills its obligation under § 151.10(f) as long as it "undertake[s] an evaluation of potential problems." South Dakota I, 314 F.Supp. 2d at 945 (quoting Lincoln City, 229 F.Supp. 2d at 1124). The RD undertook such an evaluation here. In each of her decision letters accepting the four parcels of land into trust, the RD analyzed § 151.10(f) and found that although the reservation suffered from "checkerboarded jurisdictional issues," accepting additional land into trust would not exacerbate these problems. (A.R. 610, 2073-74, 3259, 4497). As to the Peters, German, and Gardner parcels, the RD noted that taking the land into trust could possibly decrease jurisdictional issues since the new acquisitions would serve to consolidate the Tribe's land holdings. (A.R. 4497, 2072-73, 3259). The RD further explained that acceptance of the Smith parcel into trust could make jurisdictional issues "less of a hindrance, since the Tribe will clearly retain jurisdiction." (A.R. 609). Finally, the RD stated that "the City, County and Tribal law enforcement officials must work together to resolve [the] already existing jurisdictional issues." Id.. This analysis thus indicates that the RD properly considered § 151.10(f) and that there exists a rational basis for the RD's decision.

**4. The BIA's Ability to Assume Responsibility for the Four Parcels of Land**

Plaintiffs also contest the BIA's findings under 25 C.F.R. § 151.10(g). Section 151.10(g) requires the BIA to consider "whether the Bureau of Indian Affairs is equipped to discharge the additional responsibilities resulting from the acquisition of the land in trust status." 25 C.F.R. § 151.10(g). Plaintiffs argue that there is inadequate evidence supporting the RD's determination that the BIA can discharge the additional responsibilities of the four parcels of land. The Tribe directly addressed this issue in its response to Plaintiffs' comments on the Tribe's trust applications. (A.R. 1692-93).

21

The Tribe noted that the only additional responsibilities the BIA would incur as a result of accepting the parcels into trust were the "minimal administrative functions . . . such as recording land transaction documents, reviewing and approving rights of way . . . and . . . review of documents submitted for environmental review." (A.R. 1692). The Tribe also explained that the BIA already handles these administrative matters for the Tribe on a regular basis. Id. Plaintiffs have offered nothing to contradict the Tribe's submission on this issue and therefore fail to prove that the BIA's decision was arbitrary or capricious. This Court thus finds that the RD had a rational basis for her determination under § 151.10(g).

Plaintiffs' challenges to the BIA's analysis of the Part 151 factors ultimately fail because they are general disagreements with the BIA's decision to take the four parcels of land into trust. See Cent. S.D. Co-op Grazing Dist. v. Secretary of U.S. Dep't Agric., 266 F.3d 889, 898 (8th Cir. 2001) ("[A] party's mere dissatisfaction with [an agency's] decision does not entitle it to relief.") (citation omitted). Further, Plaintiffs have failed to put forth any evidence that the BIA did not actually consider a factor, which Plaintiffs must do if they wish to meet their burden of proof. South Dakota II, 423 F.3d at 800 ("In order to meet [their] burden of proof . . . [plaintiffs'] must present evidence that the agency did not consider a particular factor; it may not simply point to the end result and argue generally that it is incorrect."). Accordingly, this Court finds that the BIA's analysis of the Part 151 factors was not arbitrary, capricious, or an abuse of discretion.

**5. The Statutory Aims of § 5 of the IRA**

In discussing § 5 of the IRA, the Eighth Circuit has noted that "[t]he statutory aims of providing lands sufficient to enable Indians to achieve self-support and ameliorating the damage resulting from the prior allotment policy sufficiently narrow the discretionary authority granted to the Department." South Dakota II, 423 F.3d at 799. This Court, in South Dakota I, discussed the purposes of the IRA more generally as follows:

22

Prior to enactment of the IRA, Congress attempted to assimilate Indians into the country's mainstream through an allotment policy. General Allotment Act of Feb. 8, 1887, 24 Stat. 388, as amended, 25 U.S.C. § 331 et seq. (1976 ed.) (§§ 331-33 repealed 2000). The policy of the General Allotment Act was simple: "to extinguish tribal sovereignty, erase reservation boundaries, and force the assimilation of Indians into the society at large." County of Yakima v. Confederated Tribes and Bands of Yakima Indian Nation, 502 U.S. 251, 254, 112 S.Ct. 683, 686, 116 L.Ed.2d 687 (1992). This policy was a failure, which resulted in a loss of more than 90 million acres of Indian land. Brendale v. Confederated Tribes and Bands of Yakima Indian Nation, 492 U.S. 408, 436 n.1, 109 S.Ct. 2994, 3011 n.1, 106 L.Ed.2d 343 (1989). As a result, Congress enacted the IRA in an "attempt to encourage economic development, self-determination, cultural plurality, and the revival of tribalism." Felix S. Cohen, Handbook of Federal Indian Law 147 (1982 ed.). It was also stated that the IRA was designed to "rehabilitate the Indian's economic life and to give him a chance to develop the initiative destroyed by a century of oppression and paternalism." Mescalero Apache Tribe v. Jones, 411 U.S. 145, 152, 93 S.Ct. 1267, 1272, 36 L.Ed. 2d 114 (1973) (quoting H.R. Rep. No. 1804, 73d Cong., 2d Sess., 6 (1934)). In order to stem the staggering flow of land from Indian to non-Indian hands, the IRA set forth that "no land of any Indian reservation . . . shall be allotted in severality to any Indian." 25 U.S.C. § 461. Congress also tried to replenish Indian lands by permitting the Secretary of the Interior to acquire land in trust for Indians, noting that land held in trust is exempt from local and state taxation. 25 U.S.C. § 465.

South Dakota I, 314 F.Supp. 2d at 950-51. Plaintiffs now argue that accepting the land into trust has "not been shown to sufficiently enable Indians to achieve self-support nor has it been demonstrated to operate sufficiently to ameliorate the damage of the allotment policy." (Doc. 1 at 10). The record, however, demonstrates that the RD adequately detailed the self-support and economic benefits the Tribe would gain from taking the four parcels of land into trust. First, the RD explained how the profits from the land would benefit the Tribe's economy because they would be used to supplement Tribal programs such as the Tribal Fish and Wildlife Department, the Tribal Realty Department, and the Tribe's buffalo ranch. (A.R. 2072, 3258, 4495-96). Next, the RD explained how bringing the four parcels of land into trust would help meet the demands of an increase in tribal enrollment. (A.R. 609, 2073, 3258, 4496); see South Dakota IV, 487 F.3d at 552

23

("Taking additional land into trust to accommodate increased tribal membership is consistent with the statutory aim of enabling Indians to achieve self-support."). Finally, the RD noted that accepting the land into trust promoted tribal self-determination and ensured that the needs of future tribal generations were secured and protected. (A.R. 609, 2072, 3257, 4496). The BIA's acceptance of the four parcels of land into trust meets the statutory aims of § 5 of the IRA. See South Dakota IV, 487 F.3d at 548 (finding that the BIA acted within statutory authority of § 5 where director found that the tribe needed the land taken into trust to accommodate increased tribal membership and that the tribe's economy would benefit from the acquisition).

## IV. Conclusion

For the reasons discussed above, it is hereby

ORDERED that Defendants' Motion for Summary Judgment (Doc. 6) is granted. It is further

ORDERED that Plaintiffs' Motion for Summary Judgment (Doc. 10) is denied.

Dated February 3, 2011.

BY THE COURT:

/s/ Roberto A. Lange
ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE

24